# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| AMANDA BRYANT, a Texas resident; HARN LEE, a Texas resident; NANCY NGUYEN, doing business as SILVER'S ANDY NAILS, a sole proprietorship in Texas; JEFFREY AARON, a Texas Resident; VERONICA CANTU, a Texas Resident; and STEPHANIE OCHOA, a Texas resident; all on behalf of themselves individually and all others similarly situated;<br><br>          **Plaintiffs,**<br><br>v.<br><br>INTERCONTINENTAL TERMINALS COMPANY, LLC, a Delaware corporation; NSK CORPORATION, a Delaware corporation; and APPLIED INDUSTRIAL TECHNOLOGIES, INC., an Ohio corporation.<br><br>          **Defendants.** | **LEAD CASE NO.: 4:19-CV-01460**<br><br>**RELATED CIVIL ACTION: 4:19-CV-01708**<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>1. **TRESPASS;**<br>2. **NEGLIGENCE;**<br>3. **NUISANCE;**<br>4. **MANUFACTURING DEFECT;**<br>5. **DESIGN DEFECT; and**<br>6. **PRODUCTS LIABILITY (SELLER).**<br><br>**JURY DEMANDED**<br><br>**JUDGE NANCY F. ATLAS** |

Plaintiffs, on behalf of themselves, and on behalf of all others similarly situated in the Putative Class, allege upon information and belief:

## NATURE OF ACTION

1.     This is a class action on behalf of individuals who have suffered property damage and tangible harm to possessory rights in property, and whose quality of life and use and enjoyment of their property has been damaged by the toxic chemicals released during an emissions event and fire at a petrochemical terminal facility. The petrochemical terminal facility

1

was owned and operated by Defendant Intercontinental Terminals Company, LLC ("ITC").  The petrochemical terminal facility is located in Deer Park, Texas ("ITC Facility").

## JURISDICTION

2.      Original jurisdiction of this Court is invoked pursuant to 28 U.S.C.A. §§1331 (Federal Question) and 1332(d)(2) (Class Action).  Diversity exists between the named Plaintiffs of this class action, each of whom are citizens of the State of Texas, and Defendants each of whom are incorporated in other States.  The proposed Class exceeds 100 persons. The amount in controversy exceeds the required $5,000,000.00.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial portion of the events and omissions giving rise to Plaintiffs' claims occurred in the Southern District of Texas where the ITC Facility is located.

## THE PARTIES

### The Plaintiffs

4.      Plaintiff Amanda Bryant is above the age of majority and is a resident of Deer Park, TX.  She lives on property she owns approximately 5.1 miles from the ITC Facility.  Her children attend school in the Deer Park Independent School District that was forced to cancel classes due to the ITC fire in Deer Park.

5.      Plaintiff Harn Lee is above the age of majority and is a resident of Deer Park, TX. She lives on property she owns approximately 4.3 miles from the ITC Facility. Her child attends school in the LaPorte Independent School District that was forced to cancel classes due to the ITC fire in Deer Park.

6.      Plaintiff Nancy Nguyen is above the age of majority and is doing business as Silver's Andy Nails located in Deer Park, TX, approximately 6.3 miles from the ITC Facility.

2

7.      Plaintiff Jeffrey Aaron is above the age of majority and is a resident of Channelview, TX.  He works across the street from the ITC Facility. His three children attend school in the Channelview Independent School District that was forced to cancel classes due to the ITC fire in Deer Park.

8.      Plaintiff Veronica Cantu is above the age of majority and is a resident of Deer Park, TX.  Her child attends school in the Deer Park Independent School District that was forced to cancel classes due to the ITC fire in Deer Park.

9.      Plaintiff Stephanie Ochoa is above the age of majority and is a resident of Pasadena, TX.  She lives in property she rents approximately 7.7 miles from the ITC Facility. She has a child that attends the Deer Park Independent School District that was forced to cancel classes due to the ITC fire in Deer Park.

### The Defendants

10.     Defendant Intercontinental Terminals Company, LLC is a Delaware corporation with its principal place of business in La Porte, Texas.  It is the owner, operator and permittee of the ITC Facility, which is located at 1943 Independence Parkway South, La Porte, Texas.

11.     Defendant NSK CORPORATION ("NSK Corp.") is a foreign corporation located at 4200 Goss Road, Ann Arbor, Michigan 48105.  NSK is incorporated under the laws of the State of Delaware, has its principal place of business in Michigan, and is authorized to conduct business in the State of Texas.  NSK may be served through its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

12.     Defendant APPLIED INDUSTRIAL TECHNOLOGIES, INC. ("Applied") is a foreign corporation that is authorized to conduct business in the State of Texas.  It may be served

through its registered agent, Cogency Global, Inc., at 1601 Elm Street, Suite 4360, Dallas, Texas 75201. Applied is organized under the laws of the State of Ohio and has its principal place of business at 1 Applied Plaza, Cleveland, Ohio 44115-5030.

**CLASS ALLEGATIONS**

13.     Plaintiffs bring this claim on behalf of the following Class, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2) and 23(b)(3) and 23(c)(4).

14.     The Class consists of the individuals residing in, and the businesses, governmental entities and schools located in, the isopleth attached as Exhibit A during the ITC fires.

15.     The Class suffered physical damage to a proprietary interest, property damage and/or personal injury sufficient to satisfy the economic loss rule.

16.     The identities of all the class members are readily obtainable from governmental records.

17.     Excluded from the Plaintiff Class are the Defendants and all officers, members, partners, managers, directors and employees of the Defendants and their respective immediate families, and legal counsel for all parties to this action, and all members of their immediate families.

18.     This action has been brought, and may properly be maintained, as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community interest in the litigation:

a.     **Numerosity:**  The Plaintiffs are informed, believe, and on that basis allege, that the Plaintiff Class defined above is so numerous that joining all members would be impractical.

b.     **Commonality**: There are questions of law and fact common to the Plaintiff Class that predominate over any issues involving only individual class members. The common issues of law and fact, include, but are not limited to: (1) whether Defendants are liable for damages to the Class for the release of toxic chemicals resulting in property damage and/or for their negligent failure to plan and prepare for an emergency involving the release of toxic chemicals resulting in property damage; (2) whether Defendants are liable to the Class for the trespass, negligence and nuisance; (3) the type and scope of damages caused by Defendants' conduct; and (4) the extent to which the properties in the class area suffered a diminution in value as a result of the ITC fire. These and other common issues of law and fact relate to and affect the rights of Plaintiffs and Class Members.

c.     **Typicality**: The Plaintiffs' claims are typical of the claims of the Class Members because they reside in, or do business within the putative class area and their real property and/or personal property were damaged by contamination and impacted by harmful particulate matter linked to and emanating from the ITC fire. The claims arise out of the Defendants' common uniform course of conduct complained of herein.

d.     **Adequacy**: The Plaintiffs will fairly and adequately protect the interests of the Plaintiff Class defined in this complaint. The Plaintiffs have retained counsel with experience in handling environmental lawsuits, complex legal issues, and class actions. Neither the Plaintiffs, nor their attorneys have any interests, which might cause them not to vigorously pursue this action.

19.    Certification of a class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that the questions of law and fact common to members of the

Plaintiff Class predominate over any questions affecting an individual member, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

        a.    **Predominance:** The questions of law or fact common to class members predominate over any questions affecting only individual members. The relative importance of the claims and defenses of the parties and the nature of the evidence that will be presented far outweigh any individual issues.

        b.    **Superiority:** A class action is superior to the other available means for the fair and efficient adjudication of the controversy because individual joinder of all members would be impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum efficiently and without unnecessary duplication of effort and expense that individual actions would engender.

## FACTUAL ALLEGATIONS

20.    On Sunday, March 17, 2019 at 10:30 AM, at the ITC Facility, a leak occurred in the manifold associated with tank 80-8, containing the volatile petroleum product naphtha. The release ignited and the fire quickly spread to other adjacent tanks. Plaintiffs are informed and believe that but for negligence on the part of ITC in the construction, maintenance or operation of, or response to, the naphtha tank fire, the event would not have occurred.

21.    On Sunday, March 17, 2019 at 11:21 AM, the City of Deer Park issued a Shelter In Place Order due to the chemical tank fire at the ITC Facility. Throughout the day, Deer Park's Office of Emergency Management expanded the Shelter In Place Order to include all of Deer Park city limits.

22.     The City of Deer Park's Shelter In Place Order mandated:

**1.      GO INSIDE IMMEDIATELY**

Seek the nearest enclosed structure, whether it's a house, business, garage or vehicle.  If you know of any unattended child in your neighborhood, call them and tell them to remain in doors.  Keep any pets inside also gather emergency supplies like a portable radio, flashlight and extra batteries.

**2.      CLOSE UP**

Close all doors, windows, and other sources of outside air.  Turn off air conditioning or heating systems and close the fireplace damper to keep chemical vapors from entering.  Ceiling fans or rotary fans inside the building can be safely used to keep cool.

Cover any gaps, holes, or cracks with wet towels or sheets to prevent vapors from entering your home.  If you have trouble breathing, contact 9-1-1 and cover your nose and mouth with a damp washcloth, then take slow, shallow breaths and try to stay calm.

**3.      STAY INFORMED**

Stay off the telephone.  City officials may try to telephone your home or business using the city's computerized telephone notification system.  Do not call police, fire or 9-1-1 unless you are reporting an emergency at your location.  Overloaded phone circuits may keep actual emergency calls from getting through.

23.     On Sunday, March 17, 2019 at 1:20 PM, the City of Deer Park announced that State Highway 225 was closed to all traffic from Beltway 8 to Independence Parkway.

24.     On Sunday, March 17, 2019 at 1:25 PM, the City of Deer Park posted on Facebook that the chemical tank fire remained uncontrolled as of 1:00 PM.  At that time, the City of Deer Park extended the Shelter in Place Order:

"Residents are asked to remain sheltered and avoid going outdoors if at all

possible. Community air monitoring is being conducted and additional updates

will be provided as they become available."

25.     On Monday, March 18, 2019 at 5:30 AM, the City of Deer Park lifted the Shelter In Place Order and reopened State Highway 225.  However, portions of Independence Parkway remained closed.

26.     On Monday, March 18, 2019, The Deer Park and La Porte Independent School Districts cancelled all classes due to the hazards posed by the ITC fire.

27.     On Monday, March 18, 2019 at 12:28 PM, the City of Deer Park, through its Facebook page, reported that the tanks that were burning contained naphtha, xylene, GBS (gas blend stock) and lubricant oil.

a.     **Naphtha**: Is a flammable liquid hydrocarbon mixture.  Mixtures labeled naphtha have been produced from natural gas condensates, petroleum distillates, and the distillation of coal tar and peat.  Petroleum naphtha is an intermediate hydrocarbon liquid stream derived from refining crude oil.  It is primarily used to dilute heavy oil to make it easy to move through pipelines, to make high-octane gasoline, to make lighter fluid and to clean metal.  Thus, it is used as a fuel, to make fuel and as a solvent.

b.     **Xylene**: Is any one of three isomers of dimethylbenzene, or a combination thereof. With the formula $(CH3)2C6H4$, each of the three compounds has a central benzene ring with two methyl groups attached at substituents. It is primarily used as a solvent (a liquid that can dissolve other substances) in the printing, rubber, and leather industries. Along with other solvents, xylene is also widely used as a cleaning agent, a thinner for paint and varnishes.

c.     **GBS (gas blend stock)**: is a complex hydrocarbon used to produce fuel, particularly gasoline. It is a complex mixture of hydrocarbons consisting of paraffins, cycloparaffins, aromatic and olefinic hydrocarbons having molecular chains ranging in length

8

from four to ten carbons.  It is generally an intermediate product that is used to produce a variety of gasolines, which are used as fuel for internal combustion engines.

d.     **Lubricant Oils**: are an additive blend of refined oil.  It is a complex mixture of low and high molecular weight hydrocarbons, lubrication additives, and various organic and inorganic compounds. It often has an amber color and petroleum odor.  It can be used in combination with other products.  It is used for lubricating hydraulic systems and engines.

28.     On Monday, March 18, 2019 at 5:18 PM, the City of Deer Park stated that six tanks remained on fire.  The Deer Park Independent School District and La Porte Independent School District decided to reopen for school on Tuesday, March 19, 2019.

29.     On Tuesday, March 19, 2019 at 2:30 AM, ITC announced that a raging fire at the ITC Facility spread to two more massive tanks after the fire fighting water pumps stopped working for six hours.

30.     On Tuesday, March 19, 2019 at 12:17 PM, the City of Deer Park provided an update.  It reported that an ITC representative at a press conference stated that six tanks (80-2, 80-3, 80-5, 80-6, 80-8 and 80-11) remained on fire, that tanks (80-9 and 80-11) had collapsed during the firefighting process and that two more tanks (80-14 and 80-15) were now on fire. "Fire had intensified overnight on Monday [March 18] due to a temporary loss of water pressure and water resources between the hours of 4PM and 10PM.  The loss of water pressure was due to the malfunction of two fireboat pumps that were providing water to firefighters operating on scene."

31.     One of these two tanks (80-14 and 80-11) contained toluene, a volatile liquid used to make nail polish remover and paint thinner.

32.    On Tuesday, March 19, 2019 at 7:40 PM, the City of Deer Park noted an update from ITC.  Four tanks (80-2, 80-3, 80-5 and 80-6) remained on fire Tuesday afternoon.  Three of these tanks contained a gas blend and tank (80-5) contained xylene.

33.    On Tuesday, March 19, 2019 at 10:15 PM, the City of Deer Park reported a statement from ITC, which stated that tanks (80-2, 80-3, 80-5 and 80-14) were burning.

34.    On Wednesday, March 20, 2019, ITC issued a press release informing the public that the fire had been extinguished at 3:00 AM.

35.    A few hours later, Alice Richardson, ITC Public Information Officer, said, "The cause of the fire is still unknown, but as soon as it is safe to get our personnel in the tank farm, we will begin a root cause investigation."

36.    On Wednesday, March 20, 2019, Deer Park ISD, La Porte ISD, Sheldon ISD, Channelview ISD and Galena Park ISD cancelled classes due to the hazards of the ITC fire.

37.    On Wednesday, March 20, 2019 at 1:40 PM, the City of Deer Park stated that air monitoring continued.  Air monitoring reports indicated that Shell Deer Park experienced elevated levels of benzene in the morning.

38.    On March 20, 2019 at 7:00 PM, the City of Deer Park received confirmation from ITC that a flare-up of the fire had occurred at the ITC Facility.

39.    On Thursday, March 21, 2019 at 4:49 AM, Shelter In Place Orders were again issued by the cities of Deer Park and Galena Park after elevated levels of benzene and other volatile organic compounds were detected within the city limits of both cities.  A message from ITC informed Deer Park that the affected area is south of Tidal Road, east of Beltway 8, west of Underwood Road and north of Pasadena Boulevard.

40.     On Thursday, March 21, 2019, by 5:45 AM, the City of Deer Park expanded its closure of State Highway 225 to Highway 146 due to the elevated levels of benzene.

41.     On Thursday, March 21, 2019, by 5:45 AM, a spokesperson for ITC represented that the benzene levels: "are below those that represent an immediate risk."   However, the Texas Commission on Environmental Quality ("TCEQ") issued a statement that: "High levels of benzene detected at ITC fire site."   The TCEQ wrote: "One-hour levels of benzene in Deer Park were measured at a maximum of 190.68 parts per billion at 4 a.m., dropping to 48.03 ppb at 5 a.m. and 8.12 ppb at 6 a.m.   Short-term exposure to one-hour benzene concentrations above 180 ppb can be a cause for health concern."

42.     Due to these concerns of exposure to benzene, the City of Pasadena required all its employees living in nearby Deer Park to abide by the Shelter In Place Order.

43.     On Thursday, March 21, 2019 at 7:40 AM, the City of Deer Park announced that the Deer Park Police Department had placed barricades blocking all northbound traffic from the Pasadena Boulevard intersections, including Center Street, East Boulevard, Georgia, Oklahoma, Louisiana and Luella.   Similarly, northbound traffic from Spencer Highway was blocked at intersections that included East Boulevard, East Meadows, Luella, College Park, Academy, Center Street, Durant and Glenwood.   A barricade was also placed at the intersection of Pasadena Boulevard and Louisiana to prevent eastbound traffic on Pasadena and northbound traffic on Louisiana.   Furthermore, barricades were erected on Old Underwood at X Street and on South Battleground/Independence Parkway.   State Highway 225 was to remain closed between Beltway 8 and Highway 146.

44.     On Thursday, March 21, 2019, in addition to the Shelter In Place Orders being issued by Deer Park and Galena Park, the following school districts announced that they would

11

be closed because of environmental concerns:  Channelview ISD, Pasadena ISD, Deer Park ISD, La Porte ISD, Sheldon ISD, Galena Park ISD and Clear Horizons Early College High School (a Clear Creek ISD school).

45.     Other local educational institutions also closed, including all campuses and district offices for San Jacinto College, YES Prep East End and Southeast campuses, St. Pius V Catholic School, Texas Chiropractic College and all buildings and institutions on KIPP's Northeast Campus.

46.     On Thursday, March 21, 2019 at 11:40 AM, The City of Deer Park lifted the Shelter In Place Order because it believed benzene levels in the air had fallen below actionable limits.

47.     On Thursday, March 21, 2019, later that day, Deer Park ISD and La Porte ISD cancelled classes for Friday, March 22, 2019 even though the City of Deer Park had lifted the Shelter In Place Order.

48.     On Friday, March 22, 2019, at 12:15 PM, the dike wall containing the product released during the fire partially collapsed.  ITC sent a Shelter In Place Notification to its industrial neighbors and the San Jacinto Texas State Historic Site.

49     On Friday, March 22, 2019, at approximately 2:00 PM, the United States Coast Guard closed the Houston Ship Channel between Dow (Tucker Bayou) and the San Jacinto Monument to Crystal Bay due to the breach of the tank farm secondary containment dike wall on the north side near tank (80-7).

50.     On Friday, March 22, 2019, at 3:45 PM, a flare up occurred at the ITC Facility. ITC later informed the City of Deer Park that multiple tanks in the west side of the Deer Park facility containment area had reignited.  The fire had spewed thick, acrid smoke in a black plume

12

into the air, which was visible from at least as far as Galveston Ferry 35 miles from the terminal. Some of the chemicals leaked into the Houston Ship Channel, which links the Gulf of Mexico to Houston. This had caused the US Coast Guard to close portions of the Houston Ship Channel.

51.     The fire caused the release of toxicants harmful to human health which rained down on the real and personal property belonging to Plaintiffs and the members of the Class. Plaintiffs and the Class members were forced to take actions and expend resources to clean their property to mitigate the physical impact caused by this dangerous particulate matter. The physical impact to Plaintiffs' property was caused by contaminants emanating from and scientifically linked to the ITC fire, including but not limited to benzene, toluene, NOx, xylene, PM 10 and PM 2.5:

    a.     **Benzene**: is an organic chemical compound with the formula C6H6. It is composed of six carbon atoms in a ring with one hydrogen atom attached to each, making it a hydrocarbon. It is a natural constituent of crude oil and is one of the elementary petrochemicals. Benzene is colorless, with a sweet smell that causes the aroma common to gas stations. It is highly flammable. It is used as a precursor to manufacture more complex chemicals like ethylbenzene and cumene. It has been limited to being less than 1% of gasoline because it is a known human carcinogen.

    b.     **Toluene**: is an aromatic hydrocarbon. It is a derivative of benzene, consisting of a CH3 group attached to a phenyl group. The chemical formula for toluene is C7H8. It is a colorless liquid that has a smell associated with paint thinners. It is used to make explosives, but its most common uses are as a solvent, in particular paint thinner, and as an octane booster in various types of gasolines.

c.     **NOX**: is a chemical compound named nitrous oxide.  It is commonly known as nitrous or laughing gas.  It is made from two nitrogen atoms and two carbon atoms and has the chemical formula N2O.  At room temperature, it is a colorless, non-flammable gas.  However, at elevated temperatures, it is a powerful oxidizer.  Its most common uses include as an anesthetic to relieve pain in surgery and dentistry and as an oxidizer in rocket propellants and auto racing to increase the power output of engines.

d.     **Xylene**: is an aromatic hydrocarbon. The chemical formula for xylene is C8H10 or C6H4(CH3)2.  Xylenes are produced by the methylation of toluene and benzene.  It is colorless, sweet-smelling, highly flammable and commonly used as a solvent.

e.     **PM 10:** is a particulate matter 10 micrometers or less in diameter.  In comparison, a human hair is about 100 micrometers.  These particles are small enough to pass through the throat and nose and enter the lungs.  Short-term exposures to PM 10 have been associated primarily with worsening of respiratory diseases, including asthma and chronic obstructive pulmonary disease (COPD), leading to hospitalization and emergency department visits.  Long-term (months to years) exposure to PM 2.5 has been linked to premature death,  particularly in people who have chronic heart or lung diseases, and reduced lung function growth in children. The effects of long-term exposure to PM 10 are less clear, although several studies suggest a link between long-term PM 10 exposure and respiratory mortality.

f.     **PM 2.5**: is a particulate matter 2.5 micrometers or less.  These are generally referred to as fine particles. Particles in the PM 2.5 size range are able to travel deeply into the respiratory tract, reaching the lungs and even the bloodstream. Exposure

14

to fine particles can cause short-term health effects such as eye, nose, throat and lung irritation, coughing, sneezing, runny nose and shortness of breath. Exposure to fine particles can also affect lung function and worsen medical conditions such as asthma and heart disease. Scientific studies have linked increases in daily PM 2.5 exposure with increased respiratory and cardiovascular hospital admissions, emergency department visits and deaths. Long term exposure to fine particulate matter may be associated with increased rates of chronic bronchitis, reduced lung function and increased mortality from lung cancer and heart disease. People with breathing and heart problems, children and the elderly may be particularly sensitive to PM 2.5.

52.     On Friday, March 22, 2019, at 4:20 PM, Harris County Precinct 8 shut down the Beltway 8 Ship Channel Bridge.

53.     ITC's post-incident investigation revealed that, on December 4, 2018, ITC employees noticed that the Tank 80-8 pump was "unusually loud."  A subsequent inspection of the pump determined that it was in need of new bearings.  The pump was disassembled, and ITC's millwrights installed new NSK Model 5313 outboard bearings and NSK Model 6313 inboard bearings to support the pump's shaft.  The remainder of the pump was then reassembled and placed into operation on the Tank 80-8 manifold.

54.     On March 17, 2019, the NSK 5313 outboard bearing failed, causing vibrations within the impeller shaft that were directly transmitted to the mechanical shaft seal.  This vibration loosened the bolted connections holding the mechanical shaft seal in place.  Once the seal broke, the Naphtha escaped into the area around the Tank 80-8 pump, where it ignited and caused the incident.

55.     When the Tank 80-8 pump was taken apart to determine the cause of the incident, investigators observed that the outboard bearing (constructed using NSK 5313 bearings) had come apart, resulting in loose bearing balls and ball remnants in the bearing house, meaning that at the time of the incident the outboard bearing was no longer capable of supporting the mechanical shaft centered in the bearing house.  Most of these balls were severely deformed and/or fragmented.

56.     A subsequent metallurgical examination revealed that the Model 5313 outward bearings contained unexplained internal voids, meaning they were not as durable as solid-core ball bearings and were more likely to fail.  By contrast, the NSK 6313 inward bearings examined from the incident were solid throughout.

57.     Upon information and belief, the design and specifications for the Model 5313 ball bearings did not call for internal voids, but instead called for solid core ball bearings.  The internal voids were therefore a deviation from the intended specifications.

58.     The NSK 5313 ball bearings were sold to ITC by Defendant Applied Industrial Technologies, Inc.

## FIRST CAUSE OF ACTION

**(Trespass to Real Property Against  Intercontinental Terminals Company, LLC)**

59.     Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 58.

60.     Plaintiffs owned, or had a legal right, to possess real property.

61.     Defendants are liable for trespass as a result of migration or transport of an air contaminant or contaminants, which was other than just an odor, the result of which caused

actual and substantial damages to the Plaintiffs, as described in Texas Civil Practice and Remedies Code 75.002(h).

62.     By releasing toxic chemicals, including the black ash, residue and other chemicals into the air and/or water, Defendants entered Plaintiffs' land, and the entry was physical, intentional and voluntary.

63.     The toxic chemicals released by Defendants from the ITC facility were not produced by a natural process.

64.     Defendants' trespass caused property damage and injury to Plaintiffs' right of possession and constituted a trespass and nuisance.

65.     Defendants' actions constituted grossly negligent, outrageous, malicious, or otherwise morally culpable conduct, warranting exemplary or punitive damages sufficient to deter such conduct in the future.

## SECOND CAUSE OF ACTION

### (Negligence Against Intercontinental Terminals Company, LLC)

66.     Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 65.

67.     Defendants owed a duty to exercise ordinary care, meaning that degree of care that would be used by any chemical/petrochemical/waste products storage company of ordinary prudence under the same or similar circumstances.

68.     Defendants negligently breached the duty owed to Plaintiffs and the Class in one or more of the following ways:

    a.     failing to properly design, engineer, construct, maintain, inspect and/or operate the ITC facility;

17

b.      failing to properly store chemicals/petrochemicals/waste products;

c.      failing to have adequate emergency planning, response and other procedures in place to warn the public of and to protect the safety and welfare of the community in the event of a catastrophe;

d.      failing to provide the public and first responders accurate information on the risks of the fire;

e.      failing to provide adequate warning;

f.      failing to maintain equipment, including the Tank 80-8 bearings, manifold and seals;

g.      failing to have in place a fixed foam fire suppression system for fire prevention, control or direct extinguishment of flammable or combustible liquid within their tanks;

h.      failing to ensure that foam generating equipment, including the foam concentrate tank and pump were constructed to resist fire and heat, and/or failed to locate the equipment in an area that would be protected from exposure to fire;

i.      failing to have access to dry chemical and/or foam fire suppression materials to extinguish the fire after it started;

j.      failing to adequately train workers regarding the hazards of injecting butane into manifolds;

k.      failing to implement written procedures to maintain the ongoing fitness of Tank 80-8 injection/circulation piping components;

l.      failing to use ordinary care in developing and implementing a safety fire prevention program;

m.      failing to supervise and train workers to ensure that any safety guidelines in place would be enforced to protect against leaks when injecting butane into tank manifolds.

n.      failing to perform inspections and tests on the Tank 80-8 cargo pump discharge circulation piping and injection process piping;

o.      failing to use ordinary care in monitoring the release of air contaminants and providing adequate warnings to the community of the release of volatile organic compounds and chemicals,

p.      Defendant ITC used process piping on Tank 80-8 that was below the minimum required thickness to inject and mix butane and naphtha.

q.      Defendants caused and permitted the release of volatile organic compounds and chemicals resulting in property damage and a toxic cloud, including, but not limited to, PM 2.5, PM 10, benzene, NOx, toluene and xylene.

69.     Defendants' negligence directly and proximately caused damage to Plaintiffs and the Class, causing property damage, economic loss, annoyance, discomfort and inconvenience, use and enjoyment damages, and lost revenues and wages, and creating a trespass and nuisance.

70.     Defendants' actions constituted grossly negligent, outrageous, malicious, or otherwise morally culpable conduct, warranting exemplary or punitive damages sufficient to deter such conduct in the future.

### THIRD CAUSE OF ACTION

### (Nuisance Against Intercontinental Terminals Company, LLC)

71.     Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 70.

72.     The Plaintiffs are persons of ordinary sensibilities that were attempting to use and enjoy land at the time of the ITC fire.

73.     The Defendants' conduct related to the ITC fire created a condition that substantially interfered with the Plaintiffs' use and enjoyment of land.

74.     The Defendants' substantial interference caused unreasonable discomfort, property damage, and/or annoyance to the Plaintiffs.

75.     The Defendants' conduct related to the ITC fire was negligent, intentional, unreasonable, or abnormal and out of place of its surroundings.

76.     Plaintiffs did not consent to Defendants' conduct related to the ITC fire.

77.     The Defendants' conduct related to the ITC fire constituted a nuisance.

78.     Defendants' actions related to the ITC fire constituted grossly negligent, outrageous, malicious, or otherwise morally culpable conduct, warranting exemplary or punitive damages sufficient to deter such conduct in the future.

## FOURTH CAUSE OF ACTION

### (Products Liability – Manufacturing Defect Against Defendants NSK Corporation)

79.     Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 78.

80.     Defendant NSK Corporation ("NSK") engaged in the business of manufacturing and placing into the stream of commerce the NSK 5313 bearings that caused the incident that is the subject of this litigation.   As such, NSK is a "manufacturer" as that term is defined by Section 82.011(4) of the Texas Civil Practice & Remedies Code.

81.     NSK manufactured the NSK 5313 bearings and placed them into the stream of commerce with the expectation that those bearings would, and in fact did, reach the user or consumer without substantial change in the condition in which the bearings were sold.

82.     A manufacturing defect exists when a product deviates, in its construction or quality, from the specifications or planned output in a manner that renders it unreasonably dangerous.

83.     The NSK 5313 bearings, at the time they were placed into the stream of commerce by NSK, were in a defective condition unreasonably dangerous to the end-user. Specifically, while the specification for the NSK 5313 bearings required that they contain a solid core, the bearings sold to ITC contained internal voids (i.e., they had a hollow core) of approximately 0.33 inches.  These internal voids caused the bearings to have a smaller diameter than would similar solid-core bearings, as well as an average mass of only 78% of the inboard bearing balls.  This decreased size and mass caused the NSK 5313 ball bearings to deteriorate more quickly than if they had a solid core, causing them to fragment and come loose within the bearing.

84.     This fragmentation caused failure of the outboard bearing, which compromised resistance to thrust loading and generated the impeller shaft vibration that loosened the mechanical shaft seal and allowed the Naphtha to escape.

85.     The failure of the outboard bearing, the vibration of the impeller shaft, the loosening of the mechanical shaft seal, and the release of Naphtha would not have occurred if the NSK 5313 ball bearings—like their NSK 6313 counterparts—were manufactured with a solid core in accordance with their design specifications.  As such, this dangerous condition was a proximate cause of the ITC Deer Park fires and Plaintiffs' damages.

## FIFTH CAUSE OF ACTION

### (Products Liability – Design Defect Against Defendant NSK Corporation)

86.     Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 85.

87.     In the alternative, to the extent that the NSK 5313 ball bearings did not deviate from their design specifications, NSK is liable for Plaintiffs' damages because the design of the 5313 ball bearings was defective.  To recover for a products liability claim alleging a design defect, a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the damages for which the Plaintiffs seek recovery.

88.     The NSK's design of the NSK Model 5313 ball bearing was defective because it contained "internal voids" that rendered the bearing unreasonably dangerous for its intended use. Rather than design the bearing with internal voids, NSK should have utilized the solid-core design found in NSK Bearing Model 6313.  That this "solid core" alternative design is safer than the "internal void" design of the NSK 5313 ball bearing is demonstrated by the fact that the NSK 5313 bearings deteriorated and fragmented while the solid-core NSK 6313 bearings did not.

89.     Similarly, the existence and utilization of the NSK 6313 ball bearings in the inboard bearing demonstrates that the solid core design is both technologically and economically feasible.

90.     The "internal void" design was the producing cause of Plaintiffs' damages for the reasons discussed *supra*.  As such, NSK is liable for Plaintiffs' damages.

22

## SIXTH CAUSE OF ACTION

**(Products Liability Against Applied Industrial Technologies, Inc.)**

91.     Plaintiffs reallege and incorporate by reference as though fully set forth herein the preceding paragraphs 1 through 90.

92.     Section 82.001(3) of the Texas Civil Practice and Remedies Code defines "seller" as "a person who is engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof."

93.     As the distributors of the NSK Model 5313 ball bearings that were sold to and utilized by Defendant ITC, Applied is a "seller" as defined by the Texas Civil Practice and Remedies Code.

94.     Under Section 82.003 of the Texas Civil Practice & Remedies Code, "[a] seller that did not manufacture a product" may be held liable in a products liability action for any harm caused by that product under certain circumstances.   For example, if "the claimant proves…(a)(7) that the manufacturer of the product is…not subject to the jurisdiction of the court," then the nonmanufacturing distributor is liable under Section 82.003(a)(7).

95.     As such, in the event this Court is unable to exercise jurisdiction over NSK, or if Plaintiffs prove any other element of Section 82.003, Defendant Applied is liable for Plaintiffs' damages to the full extent that those damages resulted from NSK's defective manufacturing and design of the NSK Model 5313 bearings.

96.     Further, to the extent that Applied was a seller that (1) participated in the design of the product; (2) altered or modified the product and the ITC fire resulted from that alteration or modification; or (3) installed the product, or had the product installed, on another product and

23

the ITC fire resulted from the product's installation onto the assembled product, Applied is also a proximate cause of the March 17, 2019 explosion at ITC's Deer Park Facility and Plaintiffs' damages pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 82.003.

**CONDITIONS PRECEDENT**

97.     All conditions precedent to Plaintiffs' claims have been performed, or have been waived.

**JURY DEMAND**

98.     Plaintiffs hereby demand trial by jury on all Causes of Action in which it is permitted.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully pray for a Jury Trial and for the following relief:

1.     An Order certifying this action to proceed as a class action, authorizing Plaintiffs to represent the interests of the Class as appropriate and appointing undersigned counsel to represent the Class;

2.     An award of damages or mechanism for recovery to compensate the Class for the harm caused and make Plaintiffs and members of the Class whole, including use and enjoyment damages, property damages, annoyance and inconvenience, and lost profits and lost wages;

3.     An award of exemplary or punitive damages to the Class to deter similar conduct by the Defendants in the future;

4.     Prejudgment and post-judgment interest on all sums allowed by law; Damages for lost revenues and wages;

5.     An Order establishing such administrative procedures as are reasonable to

effectuate the relief granted Plaintiffs and the Class Members;

6.     That the Court order Defendants to pay for the costs of this proceeding, including reasonable attorneys' fees and costs, including, but not limited to, costs of Class Notice and administration; and

7.     Such other relief as the Court or Jury may deem appropriate.

**DATED: March 8, 2021.**

Respectfully Submitted,

**UNDERWOOD LAW OFFICE, INC.**

/s/ Mark F. Underwood
Attorney in charge.
Mark F. Underwood, Esquire
Texas State Bar No.: 24059341
Southern Dist. of TX Bar No. 2601475
2530 West White Avenue, Suite 200
McKinney, Texas 75071
Telephone (972) 535-6377
Facsimile (972) 292-7828
munderwood@underwoodlawoffices.com

**STAG LIUZZA, L.L.C.**

/s/ Michael G. Stag, Esq.
Louisiana State Bar No. 23314
Attorney admitted pro hac vice
Ashley Liuzza, Esq.
Louisiana State Bar No. 34645
Attorney admitted pro hac vice
One Canal Place
365 Canal Street, Suite 2850
New Orleans, Louisiana 70130
Telephone: (504) 593-9600
Facsimile: (504) 593-9601
mstag@stagliuzza.com
aliuzza@stagliuzza.com

**DENNIS SPURLING, P.L.LC.**

s/ Dennis D. Spurling
Dennis D. Spurling, Esq.
Texas State Bar No.: 24053909
Southern Dist. of TX Bar No. 718307
ddspurling@dennisspurling.com
J.P. Morgan Chase Building
3003 S. Loop West, Suite 400
Houston, Texas 77054
Telephone (713) 229-0770
Facsimile (713) 229-8444

**THOMPSON BARNEY LAW FIRM**

/s/ Kevin W. Thompson
Kevin W. Thompson, Esquire (W.V. 5062)
Attorney admitted pro hac vice
David R. Barney, Jr., Esquire (W.V. 7958)
Attorney admitted pro hac vice
2030 Kanawha Boulevard, East
Charleston, West Virginia 25311
Telephone: (304) 343-4401
Facsimile: (304) 343-4405
kwthompsonwv@gmail.com
drbarneywv@gmail.com

**BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, PC**

/s/ Van Bunch
Van Bunch, Esquire (W.V. No. 10608)
Attorney seeking pro hac vice admission
2325 E. Camelback Road, Suite 300
Phoenix, Arizona 85016
Telephone: (602) 274-1100
Facsimile: (602) 274-1199
vbunch@bffb.com

**LAW OFFICES OF
P. RODNEY JACKSON**

/s/ P. Rodney Jackson
P. Rodney Jackson (W.V. No. 1861)
Attorney seeking pro hac vice admission

401 Fifth-Third Center
700 Virginia Street, East
Charleston, West Virginia 25301
Telephone: (843) 780-6879
Facsimile: (304) 345-7258
prodjackson27@yahoo.com

**ATTORNEYS FOR PLAINTIFFS**